# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-1915/2353

_____

| | | |
|---|---|---|
| Jesse Cardenas, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| AT&T, Corp.; Lucent Technologies, | * | |
| Inc., | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: December 14, 2000
Filed: April 4, 2001

_____

Before LOKEN and MAGILL, Circuit Judges, and BATTEY,[1] District Judge.

_____

MAGILL, Circuit Judge.

Jesse Cardenas sued his employer, Lucent Technologies, Inc. ("Lucent"), alleging that its continuing failure to promote him to a supervisory position constituted age and national origin discrimination under the ADEA and Title VII, and that Lucent's promotion policies and procedures had a discriminatory impact upon Hispanics and

---

[1]THE HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

Mexican-Americans. The district court granted Lucent's motion for summary judgment on Cardenas's discriminatory impact claim, but allowed the disparate treatment age and national origin claims to go to trial. After a three-day trial, the jury returned a verdict against Lucent on Cardenas's national origin claim, awarding him $50,942 in lost wages, $50,000 in compensatory damages, and $750,000 in punitive damages. Lucent appeals the district court's denial of its motion for judgment as a matter of law. For the reasons set forth herein, we reverse.

I.

Jesse Cardenas, a Mexican-American, was hired in 1962 by Western Electric, a successor to Lucent. At the time of the trial, Cardenas worked as an investigator at Lucent's Omaha, Nebraska manufacturing facility, where he was responsible for investigating products and returning damaged or unfit products.

Lucent employed approximately 3400 people at its Omaha facility (the "Omaha Works"), which had a five-level management structure. Les Cole, an E-level manager, was the highest ranked employee at the Omaha Works. Jim Andry, a D-level manager, was the Director of Manufacturing Operations and reported directly to Cole. Andry managed four manufacturing areas, each headed by a C-level manager. The C-level managers supervised B-level managers, who in turn supervised A-level managers. The A-level was the lowest managerial level, and was itself divided into five classifications: A-1, the lowest, through A-5, the highest. The Omaha Works employed approximately 130 A-level managers and 40 B-level managers. Jim Andry had final approval responsibility for A-level manager promotions but relied entirely upon hiring managers to make promotion decisions.

At the time in question, Lucent employees could learn of opportunities for promotion in several ways. First, an employee could inform his supervisor or department manager of his interest in a particular position. Second, Lucent maintained

a computer-based system, known as ECOS, that contained information on most available managerial positions. Finally, Lucent posted job requisition forms for lateral internal management candidates on a management bid board outside the personnel office. Though nonmanagement employees were not technically eligible for lateral positions, they customarily bid for these jobs as well. Cardenas looked at the management bid board five times over the course of his career at Lucent.

Early in 1995, in response to a request from a Lucent manager, Lucent's Human Resources Manager, Doug Thoms, compiled a "promotability list" of A-level supervisory candidates. In doing so, he consulted Lucent's Diversity Manager, the Alliance of Black Telecommunications Employees ("ABTE"), and the Hispanic Association of AT&T Employees ("HISPA"). In addition, Thoms added individuals who had worked directly for him who he believed would make good supervisory candidates. Thoms looked at three factors in compiling the promotability list: (1) employees with good people skills; (2) employees who had college degrees; and (3) employees of color. When complete, the promotability list contained twenty African-American employees, four Hispanic employees, and three white employees. Cardenas did not appear on the promotability list. Cardenas had neither been recommended by HISPA nor worked for Thoms.

Later in 1995, Lucent received a large order and needed three new entry-level (A-4 level) supervisors in its Cabinet area. At the request of Fred Tirschman, the Cabinet area B-level supervisor, Judy Nebe, the Omaha Works' staffing manager, posted the new positions on the management bid board. Cardenas and another employee stated that they did not see the post. Tirschman decided not to post the position on ECOS because a manager who had recently posted an A-4 supervisor position on ECOS had received no applications from qualified candidates.

Fifteen employees applied for the positions, of whom only four were A-4 supervisors eligible for lateral transfer to the new positions; the other eleven bid for the

positions as promotions. Cardenas did not submit a bid for the positions. Tirschman selected one of the lateral candidates, Tim Parks, a white male, to fill one of the new positions, but rejected all fourteen other candidates. Instead, Tirschman used the promotability list compiled by Thoms to fill the remaining two positions, selecting Nikki Welch, a black female, and Tom Leroux, a white male. In selecting Welch and Leroux, Tirschman did not strictly adhere to the order of candidates on the promotability list, passing over several white, African-American, and Hispanic candidates. At the time of his promotion decisions, Tirschman did not know Cardenas. Cardenas never applied for the available A-4 positions, never submitted a resume to Tirschman, and never otherwise asked Tirschman to consider him for the positions.

Cardenas asserts that Lucent did not give him a fair opportunity to be promoted. Specifically, Cardenas alleges that Lucent did not permit him to take a supervisory profile record exam, even though Lucent allowed Tom Leroux to take the exam. Cardenas also claims that he publicized his desire to be promoted by speaking with various employees and by submitting resumes. At trial, a Lucent manager testified that he had told Lucent's Diversity Manager that Cardenas should be on the promotability list compiled by Thoms, but that the Diversity Manager did not want to put Cardenas on the list because he was a troublemaker. Cardenas claims that another Lucent employee, Herb Rhodes, told him that he should not have complained about Lucent's promotion practices, and that Jim Andry was angry with Cardenas and had told Rhodes that Cardenas would never be promoted as long as Andry was at Lucent. Finally, Cardenas claims that some of Lucent's managers evinced prejudice against Mexican-Americans, asserting that at a meeting in 1994, Jim Andry told some Mexican-American employees that it was less important to use Spanish-speaking employees for jobs in South America than to present a "high professional image." At the same meeting, Plant Manager John Heindel purportedly said: "If you guys worked a hundred years for AT&T, you'll never reach the level that Jim Andry and I have reached."

Prior to filing this case in federal court, Cardenas filed a discrimination charge

with the Nebraska Equal Opportunity Commission ("NEOC"). In response to Cardenas's NEOC charge, Helen Munoz, Lucent's senior equal opportunity affirmative action consultant, drafted a position statement. In that position statement, Munoz stated that Cardenas was not eligible to bid for the A-4 positions because he was not an A-4 supervisor or a candidate for promotion. She explained that Cardenas was not a candidate for promotion because he had not been recommended for promotion by his supervisor, the Diversity Leadership Team, Human Resources, or HISPA. In the position statement, Munoz erroneously stated that Cardenas was a member of HISPA, and that only management employees were eligible to use self-nomination bid forms. She acknowledged these errors during her testimony at trial.

During jury selection, Cardenas exercised a <u>Batson</u> challenge in response to Lucent's peremptory strike of a Mexican-American juror. The district court did not find Lucent's proferred reasons for its strike credible, and sustained Cardenas's challenge with respect to that juror. Following a three-day trial, the jury found for Lucent on Cardenas's age discrimination claim, and for Cardenas on his national origin claim. It awarded Cardenas $50,942 in lost wages, $50,000 in compensatory damages, and $750,000 in punitive damages. The district court reduced the award of compensatory and punitive damages to $300,000, but awarded Cardenas front pay, conditional stock options, and attorney fees.

The district court denied Lucent's motions for judgment as a matter of law and for a new trial. Lucent appeals, asserting that no reasonable jury could have found that Lucent intentionally discriminated against Cardenas based on his national origin. Lucent also appeals the district court's decision sustaining Cardenas's <u>Batson</u> challenge and argues that the damages award should be set aside.

II.

We review the district court's denial of a motion for judgment as a matter of law

-5-

de novo, applying the same standard as the district court. Feltmann v. Seiben, 108 F.3d 970, 974 (8th Cir. 1997). We view all evidence in the light most favorable to the verdict and reverse only if no reasonable jury could have returned a verdict for the non-moving party. Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir. 1997) (en banc).

Lucent argues that no reasonable jury could have found that it intentionally discriminated against Cardenas based on his national origin and, therefore, that the district court erred in denying Lucent's motion for judgment as a matter of law. Cardenas's claim that he was the victim of national origin discrimination alleges disparate treatment in violation of Title VII.[2] Thus, we apply the burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).

Under the McDonnell Douglas scheme, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Id. at 802. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Id. If the employer does so, the burden then shifts back to the plaintiff to demonstrate that the reason was in fact a pretext for discrimination. Id. at 804.

To establish a prima facie case of national origin discrimination, Cardenas must show that he: (1) is a member of a protected class; (2) applied for the promotion; (3) was qualified for the promotion; and (4) lost the promotion to persons who were not members of the protected class. Enowmbitang v. Seagate Tech., Inc., 148 F.3d 970, 973 (8th Cir. 1998). Here, Cardenas did not apply for the promotion; thus, it is unlikely that he satisfied the second requirement of a prima facie case. However, where a court has fully tried a case on the merits, it is inappropriate to return to the question of whether the plaintiff established a prima facie case. EEOC v. Avery Dennison Corp., 104 F.3d 858, 860 (6th Cir. 1997). "We need not review the adequacy of the evidence

---

[2]Cardenas's complaint also alleged disparate impact discrimination; however, the district court disposed of this claim on summary judgment.

-6-

at each stage of the <u>McDonnell Douglas</u> analysis; rather, our review concentrates on whether the record supports the ultimate finding of discrimination." <u>Sanders v. Alliance Home Health Care, Inc.</u>, 200 F.3d 1174, 1176 (8th Cir. 2000); <u>see also</u> <u>United States Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.") (emphasis in original). Accordingly, we assume without deciding that Cardenas satisfied his burden of establishing a prima facie case of national origin discrimination, and proceed to evaluate Lucent's professed legitimate, nondiscriminatory reasons for not promoting Cardenas.

Lucent presents two reasons for not promoting Cardenas to one of the three A-4 positions at issue in this case. Lucent asserts that it created the positions in response to a large U.S. West order and thus, that the positions had to be filled quickly. Therefore, Lucent used its management bid board and promotability list to fill the vacancies. Fred Tirschman filled one of the A-4 positions by selecting a lateral candidate who had submitted a bid in response to a notice posted on the management bid board.[3] Cardenas did not submit a bid. Lucent asserts that Cardenas's failure to do so is a legitimate, nondiscriminatory reason for failing to promote him. Tirschman filled the remaining two positions by selecting employees from the promotability list compiled by Doug Thoms. Thoms had not placed Cardenas on the promotability list, which contained twenty-seven employees, including four Hispanics and twenty African-Americans. Lucent points to Cardenas's absence from the promotability list as another reason for its failure to promote him. Thus, Lucent has set forth legitimate,

---

[3]Cardenas asserts that he did not see the A-4 positions in question posted on the board. However, this is not surprising, given that he looked at the bid board only five times over the course of his career at Lucent, and does not support the implication that the jobs were not posted, particularly in light of the numerous other employees who submitted bids for the same job.

nondiscriminatory reasons for its failure to promote Cardenas, and the burden shifts to Cardenas to demonstrate that Lucent's articulated reasons are mere pretext for discrimination.

In arguing that Lucent's asserted reasons for not promoting him are pretextual, Cardenas first points to the discrepancies between Helen Munoz's position statement to the NEOC and Munoz's testimony at trial. However, as Munoz had no role in filling the disputed positions, her representations to the NEOC are irrelevant. Furthermore, Cardenas is required under McDonnell Douglas to demonstrate that the legitimate, nondiscriminatory reasons Lucent presented at trial were pretext for discrimination. Accordingly, his attempts to rebut the reasons presented to the NEOC are irrelevant as well.

Cardenas next attempts to refute Lucent's argument that he was not promoted because he did not appear on the promotability list by suggesting that Lucent discriminated in compiling the promotability list. He attacks the list in two ways. First, as evidence of pretext, Cardenas cites Lucent's failure to place all non-lateral candidates who submitted bids for the A-4 positions on the promotability list. However, it is undisputed that Lucent utilized several different avenues for promotion. Among these was the submission of a bid for a job posted on the management bid board. Another avenue for promotion was the promotability list compiled by Doug Thoms. In making the list, Thoms sought recommendations from ABTE and HISPA. Thoms also added to the list individuals who had worked for him who he believed would make good supervisory candidates. The absence from the promotability list of the individuals who submitted bids for the A-4 positions merely demonstrates that the bid board and promotability list were two independent avenues for promotion; it does not support Cardenas's claim of pretext.

Cardenas also suggests that Lucent's failure to place him on the promotability list presents evidence of pretext. However, Cardenas's absence from the promotability list

is explained by the fact that he had neither been recommended by HISPA nor worked for Doug Thoms. Cardenas argues that Helen Munoz's mistaken statement that he was a member of HISPA presents evidence of pretext because HISPA only nominates its own members for promotion. However, it is unclear how Lucent's failure to delve into Cardenas's HISPA membership status in compiling its promotability list supports his contention that he was discriminated against based on his national origin. Most important, it is apparent that, far from discriminating against Hispanics in compiling the promotability list, Lucent actively sought them out. In fact, of the twenty-seven employees on the promotability list, four were Hispanic. In addition, the list contained twenty African-American employees and three white employees. In short, Cardenas failed to present any credible evidence suggesting either that Lucent's failure to place him on the promotability list was the result of national origin discrimination, or that Lucent's explanation for not promoting Cardenas was pretextual.

Third, as further evidence of pretext, Cardenas relies on statements made by Jim Andry and John Heindel allegedly evincing racial animus. Even assuming that those statements did indicate racial animus, they cannot support an inference of pretext, because neither Andry nor Heindel were involved in the hiring process for the positions at issue here. It is well established that derogatory remarks made by nondecisionmakers with no connection to an alleged adverse employment decision cannot support a reasonable inference of pretext. Floyd v. Missouri Dept. of Soc. Servs., 188 F.3d 932, 937-38 (8th Cir. 1999); Ghane v. West, 148 F.3d 979, 982 (8th Cir. 1998).

Here, Cardenas argues that Andry was a decisionmaker because he had final approval responsibility for A-level manager promotions. However, Cardenas offered no evidence that Andry was involved in the hiring process for the positions at issue, other than the fact that he signed the approval papers for the promotions. Moreover, it is undisputed that Andry played no role in either Cardenas's failure to submit a bid for the A-4 supervisor positions or Cardenas's absence from the promotability list used

by Fred Tirschman to fill three of those positions. Tirschman, not Andry, decided to fill the A-4 supervisor positions by transferring Tim Parks laterally and promoting Nikki Welch and Tom Leroux. Tirschman selected Parks from among the candidates who bid for the position. Cardenas did not submit a bid. Tirschman selected Leroux and Welch from the promotability list. Cardenas did not appear on the promotability list. Andry neither compiled the list nor selected from among the individuals who appeared on the list or submitted bids for the vacant positions. Accordingly, any alleged animus on Andry's part is irrelevant to show pretext for discrimination by the decisionmakers.

Finally, in support of his attempt to show pretext, Cardenas argues at length that various inconsistencies in Lucent's promotion scheme resulted in discrimination against Mexican-Americans. However, allegations that an employer's general practices and procedures have an adverse effect on minority promotions, though highly relevant to disparate impact claims, cannot support a claim of discrimination based on a disparate treatment theory. In this case, the district court granted summary judgment for Lucent on Cardenas's disparate impact claim, and Cardenas has not appealed that ruling. Thus, we address only Cardenas's claim of disparate treatment.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of *intentional* discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 120 S. Ct. 2097, 2111 (2000) (emphasis added); see also Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 568-69 (8th Cir. 2000). Cardenas's criticisms of the inconsistencies in Lucent's general promotion practices nowhere allege that these practices were motivated by an intent to discriminate against Mexican-Americans in general or Cardenas in particular. Cardenas offers no evidence suggesting that such a discriminatory intent existed, or that the nondiscriminatory reasons cited by Lucent for its failure to promote him were in fact pretext for discrimination. Therefore, we conclude that Cardenas entirely failed to meet his burden of showing that he was the

victim of *intentional* discrimination, and that the district court erred in denying Lucent's motion for judgment as a matter of law.[4]

III.

For the reasons stated, we REVERSE the district court's denial of Lucent's motion for judgment as a matter of law on Cardenas's national origin discrimination claim. We REMAND to the district court for the entry of a judgment consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]In its appeal, Lucent argues that the district court erred in sustaining Cardenas's <u>Batson</u> challenge to one of Lucent's peremptory strikes, and in refusing to reduce the jury's award of damages. Because we conclude that Lucent was entitled to judgment as a matter of law with respect to Cardenas's disparate treatment claim, we need not address these issues.