# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2447

_____

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | * | |
| | * | |
| | * | Appeal from the United States |
| Appellant, | * | District Court for the Eastern |
| | * | District of Arkansas. |
| v. | * | |
| | * | |
| Kohler Company, | * | |
| d/b/a Sterling Plumbing Group, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  December 13, 2002

Filed:  July 10, 2003

_____

Before MORRIS SHEPPARD ARNOLD, RILEY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

The Equal Employment Opportunity Commission ("EEOC") brought this action against Kohler Company based upon former employee John Reynolds's claim that race discrimination motivated Kohler to fire him after a company-policy violation

investigation.[1] The EEOC filed claims for discrimination and retaliation on Reynolds's behalf. The jury found that Kohler did not discriminate against Reynolds, but that Kohler did retaliate against him for bringing the claim. The District Court[2] granted Kohler's motion for judgment as a matter of law finding that Kohler's reasons for firing Reynolds were legitimate and that Reynolds offered no evidence of retaliation. The EEOC appealed.[3] We reverse.

I.

Reynolds, an African American, worked at Kohler for almost six-and-a-half years before his termination on January 6, 1998. Reynolds worked as a "quota" employee, meaning that he had to buff thirty-five sinks per hour, or 280 sinks during his shift from 7 a.m. to 3:30 p.m. However, Reynolds often did not have enough parts to meet his production quota because his output depended on the production of those ahead of him on the line. When that occurred, Company policy required Reynolds to work his entire eight-hour shift in order to be paid his full salary for the day. In contrast, on days when Reynolds met his daily quota of 280 sinks prior to the end of his eight-hour shift, he could leave work early and still receive a full day's pay.

At some point during his employment, Reynolds began clocking in at 6 a.m. and clocking out at 2:30 p.m. However, he did not begin work until 7 a.m., thus working only seven hours while being paid for an eight-hour shift. Reynolds testified that when he clocked in at 6 a.m., he would not have sinks to work on from the third shift, so he would not begin working until 7 a.m. He also testified that he had worked

---

[1] Reynolds worked at Kohler's Searcy, Arkansas, plant, doing business under the name Sterling Plumbing Group.

[2] The Honorable Stephen M. Reasoner, United States District Court Judge for the Eastern District of Arkansas.

[3] The EEOC did not appeal the jury's verdict in Kohler's favor on the race discrimination claim.

these hours over an extended period without reprimand, and that other employees, including Michael Senko, Jeremy Askins, and Howard Bailey, three Caucasian men, also kept the same schedule. For example, Reynolds testified that Bailey would clock in early and return to his truck to sleep during his shift hours. Also, he testified that Senko, Askins, and Bailey often spent their shift hours in the break room with Reynolds when they did not have parts to work on, a fact that Bailey admitted at trial. Senko, Askins, and Bailey disputed most of this testimony, stating that when they clocked in at 6 a.m., they immediately began working.

Kohler's personnel policy did not permit clocking in and out at unauthorized times without a foreman's permission. Kohler, however, did not begin to enforce the policy until May 1996 when John Dickson, the plant manager, ordered all employees to clock in no earlier than fifteen minutes before their shifts began. Despite this order, many employees, including those on the first shift, continued to clock in early. Kohler also maintained a policy that employees who had a per-hour quota could leave work early if they met that quota before the end of their eight-hour shift. Dickson testified, that the company enforced that rule "off and on." It appears that Kohler instituted, retracted, enforced, and ignored other such policies over the years. As a result, employees and managers were, at times, unclear about the state of the company's policies.

In July 1997, Charles Davis became Reynolds's immediate supervisor on the first shift. Late that summer, second-shift foreman Royce Hulsey told Davis that he saw Reynolds leaving the plant premises before Reynolds's shift ended. On August 28, 1997, Davis issued a written warning to Reynolds for not keeping his area clean and for not getting his time card signed by the foreman. Despite the warning, Reynolds only obtained a supervisor's signature on his time cards on four occasions

between September 1, 1997, and December 10, 1997.[4] Davis testified that prior to August 28, 1997, he had no problems with Reynolds's job performance. However, in November or December 1997, another foreman testified that Davis referred to Reynolds as a "dumb nigger."

In December 1997, Davis informed Rebecca Miller, the human resources director, that Hulsey saw Reynolds off-site between 2:30 p.m. to 3:30 p.m. during the last hour of his scheduled shift. Miller called a meeting on December 10, 1997, with Reynolds, Davis, and a union representative to discuss Reynolds's work schedule. Miller's notes from that meeting indicated that Reynolds acknowledged that his shift hours ran from 7 a.m. to 3:30 p.m., and that he had modified his shift to run from 6 a.m. to 2:30 p.m. without permission. Her notes also indicated that Reynolds acknowledged that he did not start work until 7 a.m., but that he did not know that clocking in and out early was a violation of company policy. At the close of the meeting, Miller told Reynolds that she would have to notify Dickson about the problem. Reynolds then told Miller that he believed he was singled out by Davis because of his race. Both Reynolds and the union representative told Miller that they believed that other employees were keeping the same schedule. They, however, did not provide the names of those employees, and Miller never investigated the allegations.

Over most of the next month, Miller and Davis reviewed Reynolds's time cards to observe his clock-in and clock-out times. They noticed that he had failed to have a foreman sign his time cards as required. They also reviewed Bailey's time cards and found that his clock-in and clock-out times were either during the same minute or within a minute of Reynolds's times. They, however, did not question Bailey about

---

[4] Time-card evidence admitted at trial showed that Senko, Askins, and Bailey also often failed to get their time cards signed during this time period.

modifying his shift or about the curiously close correlation between his and Reynolds's clock-in and clock-out times.

On January 6, 1998, Miller recommended to Dickson that he discharge Reynolds. She also showed him the close correlation between Bailey's and Reynolds's time cards. Dickson then met with Reynolds, Miller, and the union representative. Dickson testified that when he asked Reynolds why he left work at 2:30 p.m., Reynolds responded that he did so because others were keeping the same schedule. Reynolds also denied clocking Bailey in and out. Dickson then accused Reynolds of cheating the company by working only seven hours without producing his eight-hour quota. Reynolds responded that he was being singled out because he was black.[5] Reynolds again refused to name the other violators because he did not want anyone to be discharged. To avoid his own discharge, Reynolds offered to remit to the company the extra hours of pay he had received. Dickson ended the meeting by telling the group that he would have to think about the matter before making a decision. Dickson fired Reynolds later that day.

The union filed a grievance on Reynolds's behalf, noting that Senko and Askins also had clocked in and out early. However, after reviewing their time cards, Miller concluded that even though the two clocked in early, they usually worked over eight hours per shift and met production. Miller also determined that when Senko and Askins worked more than eight hours in a day, they only claimed pay for eight hours. Miller concluded that they had not engaged in the same conduct as Reynolds, and she denied the grievance.[6] Furthermore, Miller testified that although Bailey's time cards showed the same hours as Reynolds's–so much so that it prompted Dickson to accuse

---

[5] Dickson testified at trial that he was "upset" at Reynolds's allegation of discrimination.

[6] The company disciplined Senko and Askins for failing to work their assigned shifts. This disciplinary action occurred several months after Reynolds's termination.

Reynolds of clocking in and out for Bailey–neither Miller nor Dickson questioned Bailey about the oddity or investigated whether he was working his full eight-hour shift.

On July 8, 1999, the EEOC filed this Title VII action, alleging that Kohler discriminated against Reynolds because of his race and discharged him in retaliation for complaining of race discrimination. In the course of this action, the EEOC's claims survived summary judgment and two requests for directed verdict. At the conclusion of trial, the jury returned a verdict in Kohler's favor on the EEOC's race-discrimination claim and against Kohler on the retaliation claim. It also awarded Reynolds $40,000 in compensatory damages and $50,000 in punitive damages for his retaliation claim.

On March 12, 2001, Kohler moved for judgment as a matter of law or for a new trial on the retaliation claim. In the alternative, Kohler sought remittitur on the punitive-damages award. Kohler argued that the evidence at trial was insufficient to sustain the jury's verdict on the retaliation claim. Specifically, Kohler contended that the evidence failed to establish a causal connection between Reynolds's race-discrimination complaint and his termination. Kohler also argued that even if the court upheld the jury's verdict, it should set aside the punitive-damages award because there was no evidence to support the conclusion that Dickson or Miller retaliated against Reynolds with malice or reckless indifference to Reynolds's federally-protected rights.

On March 27, 2002, the District Court granted Kohler's motion for judgment as a matter of law. The District Court determined that while the EEOC established the first two elements of a prima facie case of retaliation, it failed to meet the third element that the adverse employment action occurred because of Reynolds's claim of discrimination. The court determined that Kohler paid Reynolds for time he did not work, and that when confronted with this proof, Reynolds admitted this infraction.

The District Court also found that Senko and Askins were not similarly situated because different managers supervised them, and the level and nature of their infractions "did not approach the frequency of Reynolds's actions, and they engaged in conduct that was different." Lastly, the District Court noted that Reynolds refused to supply the names of other employees who were committing the same infraction, thus defeating Reynolds's claim that Kohler did not properly investigate his discrimination complaint. The District Court granted Kohler's motion for judgment as a matter of law, dismissed as moot Kohler's alternative motions for new trial or remittitur, and dismissed the EEOC's complaint with prejudice.

## II.

### *Standard of Review*

We review de novo the District Court's grant of judgment as a matter of law, applying the same standard used by the District Court. *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 988 (8th Cir. 1999) (en banc). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the non-moving party. Fed.R.Civ.P. 50(a)(1). When the parties have developed a full trial record, we are not concerned with plaintiff's prima facie case. What is relevant, at this point, is simply whether the plaintiff's evidence permits a reasonable inference of discrimination or retaliation. *See U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 717 (1983); *Cardenas v. AT&T Corp.*, 245 F.3d 994, 998 (8th Cir. 2001). The court must determine whether there was sufficient evidence to support the jury's verdict. *Id.* A jury's verdict must be affirmed "unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could not have found for that party." *Cross v. Cleaver*, 142 F.3d 1059, 1066 (8th Cir. 1998). When reasonable persons could differ as to the conclusion to be drawn from the evidence, the motion must be denied. *Smith v. Riceland Foods*, Inc., 151 F.3d 813, 818 (8th Cir. 1998); *Ryther v. KARE 11*, 108 F.3d 832, 844 (8th Cir. 1997) (en banc). "[W]e will not set aside the jury's verdict lightly." *Triton Corp. v. Hardrives, Inc.*, 85 F.3d 343, 345 (8th Cir. 1996).

We are reminded of the directive that judges must be extremely guarded in granting judgments as a matter of law after a jury verdict. As this court has often repeated, the standard to be applied is as follows:

> [T]he district court must (1) consider the evidence in the light most favorable to the prevailing party, (2) assume that all conflicts in the evidence were resolved in favor of the prevailing party, (3) assume as proved all facts that the prevailing party's evidence tended to prove, and (4) give the prevailing party the benefit of all favorable inferences that may reasonably be drawn from the facts proved. That done, the court must then deny the motion if reasonable persons could differ as to the conclusions to be drawn from the evidence.

*Haynes v. Bee-Line Trucking Co.*, 80 F.3d 1235, 1238 (8th Cir.1996) (citations omitted).

## III.
### *Analysis*

Title VII prohibits employers from retaliating against employees who file charges of discrimination or who assist others in opposing discrimination. 42 U.S.C. § 2000e-3(a). The legal framework for analyzing retaliation claims under Title VII is the familiar three-stage, burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, a plaintiff must first establish a prima facie case of retaliation. To do this, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse employment action and the protected activity. *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270 (8th Cir. 1996). A defendant must then rebut the plaintiff's prima facie case by presenting evidence of a legitimate, non-retaliatory reason for the action it took against the plaintiff. *Coffman v Tracker Marine, LP*, 141 F.3d 1241, 1245 (8th Cir. 1998). If the

defendant makes this showing, the plaintiff must then establish that the defendant's proffered reason was a pretext and that illegal retaliation was a motivating reason for the defendant's decision. *Id.* However, once a trial on the merits has occurred, the issue of whether the plaintiff established his prima facie case is moot, and the question then becomes whether the plaintiff produced sufficient evidence to allow the jury reasonably to find that the defendant intentionally retaliated against the plaintiff because of statutorily-protected conduct. *Cardenas*, 245 F.3d at 998 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997)); *Ryther*, 108 F.3d at 838.

"Once a finding of discrimination [or retaliation] has been made and that judgment is being considered on appeal, the *McDonnell Douglas* presumptions fade away, and the appellate court should simply study the record with a view to determining whether the evidence is sufficient to support whatever finding was made at trial." *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000) (quoting *Morgan v. Arkansas Gazette*, 897 F.2d 945, 948 (8th Cir. 1990)). Thus, the principal issue before us is whether Reynolds produced sufficient evidence to allow a reasonable jury to find Kohler retaliated against him.

We first consider Kohler's professed legitimate non-discriminatory reasons for discharging Reynolds. Kohler fired Reynolds because he "cheated" Kohler out of one hour of pay by regularly working only seven hours in an eight-hour work day while accepting pay for the full eight hours. The EEOC acknowledges that Kohler met its burden of producing a legitimate non-discriminatory reason for Reynolds's discharge. Therefore, the burden shifts to the EEOC to demonstrate that Kohler's articulated reasons are mere pretext for retaliation.

The EEOC argues that the proximity of Reynolds's complaint of discrimination in relation to his discharge[7] coupled with Kohler's inconsistent enforcement of its policies and use of disciplinary actions established facts from which a reasonable jury could have drawn the conclusion that Kohler retaliated against Reynolds. Viewing the record as a whole and in the light most favorable to the EEOC, we agree.

To begin with, the timing of Reynold's termination in relation to his complaint of discrimination raises an inference that Kohler terminated him in retaliation for making a discrimination claim. We recently discussed the issue of temporal proximity

---

[7] We note that the District Court, in part, granted judgment as a matter of law after determining that Reynolds failed to meet the third element of a prima facie case of retaliation, the "causal connection" element. Returning to this inquiry, however, was improper because the case had been tried on the merits. At that point, the issue of whether the plaintiff established his prima facie case is moot. *Cardenas*, 245 F.3d at 998; *Ryther*, 108 F.3d at 838; *Avery Dennison Corp.*, 104 F.3d at 860. This is so because the trial court's duty after trial on the merits, like our duty on appeal, is to "simply study the record with a view to determining whether the evidence is sufficient to support whatever finding was made at trial." *Sherman*, 235 F.3d at 409; *Morgan*, 897 F.2d at 948. That is not to say that we should not consider the evidence concerning the "causal connection" or timing of Reynolds's discharge in relation to his complaint of discrimination. Rather, it is the context in which the reviewing court considers the evidence after trial that controls how the court weighs that evidence. For example, while the timing of a plaintiff's discharge in relation to his protected activity can sometimes establish the causation element of a prima facie case, *see Smith*, 151 F.3d at 820 n. 5, timing alone is usually insufficient to establish that the employer's legitimate non-discriminatory reason for discharge is pretext. *See Stevens*, 97 F.3d at 272. Instead, in reviewing a judgment as a matter of law, the timing of the discharge is evaluated along with the other evidence in the record to determine whether the evidence was sufficient to support the jury's verdict. *See Sherman*, 235 F.3d at 410. As applied to this case, the District Court's evaluation of the causal-connection evidence to support its finding that Reynolds failed to make a prima facie case was in error; however, evaluating the timing of Reynolds's complaint to his discharge in light of all of the evidence in the record is permissible and required, and it is a task we undertake here. *See Cardenas*, 245 F.3d at 998.

-10-

thoroughly in *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827(8th Cir. 2002). In *Smith,* we summarized several relevant cases and highlighted their significance. In particular, we noted the difficulty in neatly analyzing our treatment of temporal proximity. But this much is clear: temporal proximity rises in significance the closer the adverse activity occurs to the protected activity. The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes. *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893 (8th Cir. 2002). In *Kipp*, the time interval between protected activity and adverse activity diluted the inference of causation to such a degree that in the absence of other evidence, the plaintiff's claim failed.[8]

Reynolds voiced his claim that race motivated the company's actions on two occasions–at the December 10 meeting with Miller, after which she decided to recommend termination to Dickson, and at the January 6 meeting with Dickson. Within hours of that meeting, Dickson terminated Reynolds. The District Court determined that the temporal proximity between Reynolds's complaint and his discharge was too broad to support a finding that the complaint was causally connected to the termination. Whether one considers the December meeting or the January meeting as the first time Reynolds complained to a "decisionmaker," the temporal proximity between the complaint and the adverse employment action is short–less than one month. This proximity, coupled with evidence that Reynolds's discrimination allegation "upset" Dickson, forms the basis for an inference that a causal connection existed between Reynolds's claim and his termination.

While timing of the discharge alone is insufficient to sustain the jury's verdict on the retaliation claim, the EEOC buttresses its case with additional evidence showing Kohler's lax enforcement of its company policies and disciplinary actions.

---

[8]The plaintiff in *Kipp* also could not show similar employees were treated differently because there was no evidence the company knew other employees were in violation of company policy.

The EEOC argues that Kohler disciplined Reynolds disproportionately to other employees who violated company policies, such as failing to have forepersons sign their time cards or clocking in and out at odd hours. The EEOC also argues that Kohler's unequal use of discipline shows that the company's decision to terminate Reynolds was due to a retaliatory motive.

Although Kohler asserts that its "zero-tolerance" policy mandated Reynolds's discharge when Reynolds accepted pay for time he did not work, management's conduct and evidence of lesser "sanctions" in similar situations belies this assertion. To begin with, management's conduct in handling Reynolds's termination could support an inference of retaliatory motive. For example, Miller decided to recommend termination prior to reviewing Reynolds's or any other employee's time cards or performing any other investigation regarding the allegations against Reynolds.[9] In addition, Dickson contributed to the implication of retaliatory motive by taking time to consider the facts regarding Reynolds's sanction. Such "consideration" undermines Kohler's claim that this particular infraction mandated immediate termination under the alleged "zero-tolerance" policy.

Kohler's lax enforcement of company policy and disciplinary procedures provided additional evidence from which a jury could have found retaliatory motive. The EEOC offered evidence that four Kohler employees–Senko, Askins, Bailey, and Alan Dickson, the plant manager's son–violated similar policies and either were not disciplined or were disciplined with less severity. Kohler responds that each of these employees' violations differed in several respects from Reynolds's violation.

---

[9] Miller and Davis admittedly only reviewed two months' worth of Reynolds's time cards. Therefore, the District Court's determination that Reynolds had been keeping these hours for an extended time–up to two years–was information that Miller and Davis did not have at the time that Miller and Dickson determined that discharge was an appropriate sanction.

-12-

Kohler offered various reasons why it singled-out Reynolds for discipline and, ultimately, termination–including that Reynolds failed to get his time-cards signed by a foreman, that he had adjusted his shift hours, that he left the work site an hour before his regular shift was over, and that he worked only seven hours of his eight-hour shift for an extended length of time. Kohler's lax enforcement of company policies and employee discipline, however, undermines its reasons for Reynolds's discipline and termination. Kohler first investigated Reynolds based on a report from a foreman that Reynolds was not at work during the 2:30 p.m. to 3:30 p.m. hour that was part of the regular first-shift schedule. Reynolds acknowledged that he, as others, had modified his shift hours without a foreman's permission, but that he had worked the modified shift for some time without repercussion. Furthermore, the evidence indicated that Senko, Askins, and Bailey kept these same hours even after Kohler terminated Reynolds, but were not approached about or disciplined for their conduct until months after Kohler fired Reynolds. As to Reynolds's failure to have time cards signed by a foreman, the evidence indicates that other employees, such as Senko, Askins, and Bailey, also failed to comply with this formality, yet they were not disciplined for this failure.

Kohler claims that the main reason it fired Reynolds was because Reynolds worked only seven of the eight hours in his regular shift, but accepted pay for the full eight hours. Kohler asserts that this violation constituted a "zero-tolerance" infraction requiring immediate termination. However, the record reflects evidence that similar violations did not receive a "zero-tolerance" reaction, thus creating a basis upon which a jury could have determined that Reynolds's complaint of discrimination was a contributing factor to his termination.

Kohler argues that these employees were not similarly situated to Reynolds. Thus, Kohler argues, comparing their treatment for violating policy to Reynolds's treatment is fruitless. The test to determine whether employees are "similarly situated" to warrant a comparison to a plaintiff is a "rigorous" one. *Harvey v.*

-13-

*Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994). "Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects." *Lynn v. Deaconess Medical Ctr.–West Campus*, 160 F.3d 484, 487 (8th Cir. 1998) (citation omitted). Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. *Id.* at 487–88. To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of "'comparable seriousness.'" *Lanear,* 843 F.2d at 301 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). *Compare Kendrick v. Commission of Zoological Subdistrict*, 565 F.2d 524, 527 (8th Cir. 1977) (two instances of fighting not sufficiently similar for disciplinary purposes). A plaintiff may prove allegations of disparate treatment by demonstrating that he was treated less favorably than similarly situated employees outside the plaintiff's protected class. *See Barge v. Anheuser–Busch, Inc.*, 87 F.3d 256, 259–60 (8th Cir. 1996); *Johnson v. Legal Servs. of Arkansas, Inc.*, 813 F.2d 893, 896 (8th Cir. 1987). For discriminatory discipline claims, "[e]mployees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways. " *Id.* (citations omitted); *Palesch v. Missouri Commission on Human Rights*, 233 F.3d 560 (8th Cir. 2000). The appellant has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence. *See Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000); *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).

First, the evidence at trial showed that Alan Dickson was disciplined, but not fired, for failing to comply with a company policy that required employees to stay at work for more than eight hours if their production during the eight-hour shift exceeded quota and qualified for overtime pay. Alan Dickson, however, did not remain at the job site as required, thus accepting pay in violation of company policy. When Kohler confronted Alan Dickson with this violation, Kohler allowed Alan

Dickson to reimburse the company for pay he received for overtime hours for which he was not present. More importantly, Kohler did not fire Alan Dickson for this violation of company policy. Although Kohler points out that Alan Dickson produced work during his regular shift hours, the fact remains that Alan Dickson violated company policy, was overpaid due to this violation, but was not terminated. That does not reflect "zero tolerance." Furthermore, evidence at trial indicated a factual dispute existed as to whether Senko and Askins began working at 6 a.m. after they, too, modified their shift hours. Despite this conflicting evidence, Kohler never investigated these allegations and did not discipline these employees until months after the company fired Reynolds. Finally, Bailey's time cards indicated that he clocked in and out at nearly the same time that Reynolds punched the clock. However, although Miller and Dickson were aware of this oddity at the time of the January 6 meeting (as evidenced by Dickson's accusation that Reynolds clocked in and out for Bailey in violation of company policy), Kohler never investigated Bailey's conduct despite the company's alleged "zero-tolerance" policy.

In citing the above evidence, we do not suggest that Kohler discriminated against Reynolds because of his race. We are cognizant of the fact that the jury ruled in Kohler's favor on the EEOC's discrimination claim; that claim is not before us on appeal. Rather, we cite this evidence to show that in viewing the record evidence as a whole and in the light most favorable to the EEOC, sufficient evidence exists for a reasonable jury to find that Kohler reacted to Reynolds's complaint of discrimination by terminating his employment. This court has long held that "[i]n a jury case, where conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn." *Ryther*, 108 F.3d at 845 (quoting *Anglen v. Braniff Airways*, 237 F.2d 736, 740 (8th Cir. 1956) (citing *Lavender v. Kurn*, 327 U.S. 645, 652–53 (1946))). This jury had before it several instances of disputed evidence bearing on Kohler's reasons for firing Reynolds. The jury believed that Kohler's reasons were pretext for retaliation. Therefore, we reverse

the District Court's grant of judgment as a matter of law, reinstate the jury's verdict, and remand for further proceedings consistent with this opinion.

RILEY, Circuit Judge, dissenting.

After admitting he claimed eight hours of pay for seven hours of work over a period of time, Reynolds alleged the only reason Kohler cared about his behavior was because he was black. Pressed on who else had behaved as he, Reynolds refused to name a single employee. From discovery through trial, the EEOC was also unable to produce a single similarly situated employee who had engaged in the same conduct. Thus, the resolution of this appeal hinges on the answer to this question: when an employee admits to cheating his employer, then claims discrimination, which upsets the decision maker, who soon thereafter discharges the employee, can the employee's retaliation jury verdict stand without any evidence that a similarly situated employee was not discharged for the same conduct? Because an affirmative response does not faithfully follow precedent and would yield unwieldy results, I respectfully dissent.

To uphold the jury verdict, the majority provides three reasons: (1) the temporal proximity of Reynolds's race allegation and discharge; (2) the decisionmaker, Dickson, became upset when Reynolds claimed discrimination after being confronted with cheating; and (3) Kohler's lax enforcement of its zero tolerance policy. The critical issue is whether Kohler's discharge of Reynolds differed from its treatment of similarly situated employees. Before addressing this quintessential question, I must first address the majority's discussion leading up to its similarly situated analysis.

The majority believes the district court erred by discussing the third element of a prima facie case of retaliation (i.e., causal connection) in deciding to overturn the jury verdict. I do not agree. Last year, our court overturned a jury verdict because

the employee failed to establish a prima facie case of retaliation by failing to show a causal connection. Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 896-98 (8th Cir. 2002) (Arnold, J. Morris S.). Regardless of whether we analyze the case as the district court did[10] and this court did in Kipp, or whether we use a sufficiency of the evidence standard, we are still searching for the same thing: does the evidence support a retaliation finding? No matter the analytical path, the evidence must support a reasonable inference that Kohler discharged Reynolds because of his race discrimination assertion.

Before discussing the merits of the EEOC's retaliation claim, we must remind ourselves the jury decided race was **not** a motivating factor in Kohler's decision to discharge Reynolds, and the EEOC has not appealed that verdict.[11] When confronted with his admitted cheating, Reynolds could have alleged any type of discrimination to escape a highly probable discharge. Our analysis would not change had Reynolds claimed discrimination based on religion, sex, national origin, disability or age. Race discrimination is not an issue on appeal–only retaliation.

## A.  Temporal Proximity and Dickson's Response Do Not Establish Retaliation

The majority relies, in part, on temporal proximity as proof Kohler retaliated against Reynolds. Dickson confronted Reynolds with cheating the company by

---

[10]The district court may have regretted submitting the retaliation claim to the jury. When discussing Kohler's motion for judgment as a matter of law at the conclusion of the EEOC's case, the district court stated "I am not impressed that the discharge case is very strong, and I think the retaliation case is even weaker."

[11]The EEOC and the majority recite another foreman's testimony that he heard Davis refer to Reynolds as a "dumb nigger." The record contains no evidence either Miller or Dickson knew about this comment. Reynolds testified he had never observed racial animus or discrimination by Miller or Dickson. Because the jury found no race discrimination, this highly inflammatory reference is absolutely irrelevant in this appeal involving retaliation alone.

working seven hours while claiming pay for eight. Reynolds then countered the only reason Dickson cared was because Reynolds was black. Dickson discharged Reynolds later that day. To avoid an inference of retaliation, would the majority require Dickson to wait a day, a week or a month before discharging Reynolds? Reynolds's discrimination allegation after being confronted with cheating simply did "not clothe [him] with immunity for past and present inadequacies." Kniebert v. Thomson Newspapers, Mich. Inc., 129 F.3d 444, 455 (8th Cir. 1997) (internal quotations omitted).

Our court has made it clear that, "[a]lthough contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). As the majority concedes, "a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." Kipp, 280 F.3d at 897; Kiel, 169 F.3d at 1136 ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."). Because the timing of the discrimination allegation and the ensuing discharge do not provide an inference of retaliation in this case, we must look to other facts to see if the EEOC presented sufficient evidence to uphold the jury verdict.

The majority states temporal "proximity, coupled with evidence that Reynolds's discrimination allegation 'upset' Dickson, forms the basis for an inference that a causal connection existed between Reynolds's claim and his termination." This untenable principle would reward employees for claiming discrimination every time they get caught violating workplace rules.

What does the record show about Dickson becoming "upset?" The union representative who accompanied Reynolds to the January 6 meeting testified that,

after Reynolds said he was being singled out based on his race, Dickson "acted like it bothered him." When Dickson was asked about his response to Reynolds's race discrimination accusation, Dickson said he "told John [Reynolds] that that was ridiculous and he knows better than that . . . that that's not a reason. John was a friend of mine. It had nothing to do with the fact that he was black." Dickson said he was upset for three reasons: "One is that he said he cheated on his time. And secondly, as he told me, he'd been fired from his last job for the same thing. And then thirdly, he came up with that statement." Dickson said Reynolds's accusation "kind of upset me because he was throwing that out, as it appeared to me, just as kind of a last ditch effort to give cause for why we were terminating him, and it had nothing to do with it." Becoming upset when charged with racism might be an appropriate reaction.

What response would the majority find did not raise an inference of retaliation? If Dickson remained stone-faced when Reynolds charged him with racial discrimination, would that have negated an inference of retaliation or would silence have allowed an inference Dickson did not dispute the charge? Notwithstanding the temporal proximity or Dickson's response, this entire case hinges on whether Kohler failed to discharge other similarly situated employees who had engaged in Reynolds's conduct.

B.    **Retaliation Claim Hinges on Rigorous Similarly Situated Employee Analysis**

The majority repeatedly intimates Kohler's failure to investigate whether other employees had engaged in similar conduct allows an inference of retaliation. Nothing in our law requires an employer who confronts an admitted pay cheat to conduct an investigation to determine whether other employees had engaged in the same conduct. Furthermore, the conceptual difficulty with using Kohler's failure to investigate other employees' conduct as an inference of retaliation is Reynolds's refusal to name a single employee whom he claimed had done what he did. According to Miller,

-19-

Reynolds said he did not want to provide other names because he did not want to get anyone fired, which infers he believed he was on the verge of being discharged. Even the EEOC could not find a similarly situated employee who had consistently claimed eight hours of pay for seven hours of work.

The majority focuses on Kohler's zero tolerance policy in general and Kohler's lax treatment of other employees for similar conduct. The proper focus should be on Kohler's treatment of similarly situated employees who engaged in the same conduct as Reynolds. Because the EEOC alleged Kohler's discharge of Reynolds was inconsistent with Kohler's treatment of other employees, the EEOC had the burden to prove those other employees were "similarly situated in all relevant respects." Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (internal quotations omitted). "Employees are similarly situated when they are involved in or accused of the **same offense** and are disciplined in different ways." Id. (internal quotations omitted) (emphasis added). "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and **engaged in the same conduct without any mitigating or distinguishing circumstances**." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (emphasis added). The majority recognized this rigorous test, see Harvey, 38 F.3d at 972, but then applied an unexacting analysis.

Kohler compensated its employees based on straight time or production. If an employee met his production quota, he did not have to work an entire eight-hour shift. If an employee could not meet his production quota, he was required to work the entire eight hours. Reynolds, who usually worked straight time, admittedly took an hour break at the beginning of his eight-hour shift, which resulted in him consistently working seven hours and claiming eight hours of pay. In deciding whether the trial court erred in overturning the jury verdict, we must ask whether the EEOC presented evidence that Dickson failed to discharge other employees who produced only seven hours of work for eight hours of pay. The EEOC did not.

To support its retaliation claim, the EEOC argued Kohler treated Senko, Askins, Bailey and Alan Dickson differently. None were similarly situated to Reynolds. The EEOC points out these employees clocked in and out early, were seen in the breakroom during the workday, did not always meet production, and "may have claimed pay for hours they had not worked." The EEOC had the burden to prove these employees were similarly situated in all relevant aspects, not that they "may have" been similarly situated.

Askins, Senko and Reynolds were not similarly situated in all relevant respects. The EEOC's key testimony was Askins and Senko clocked in early and did not always go directly to work. However, Reynolds did not testify Askins and Senko worked seven hours to receive eight hours of pay or failed to meet production quotas. The unrefuted evidence shows, even though Askins and Senko clocked in early on a regular basis, they frequently worked more than eight hours and achieved eight hours of production. Even when Askins and Senko worked more than eight hours, they only claimed eight hours of pay if they only completed eight hours or less of production. Even though Miller knew Askins and Senko clocked in early, she had no evidence they did not work once they clocked in. Whether Askins and Senko clocked in or out early does not prove retaliation, because the real issue in the similarly situated analysis is whether Askins and Senko claimed eight hours of pay for seven hours of work, the same conduct in which Reynolds had engaged. Because the record does not show they did, Askins and Senko are not similarly situated to Reynolds.

Reynolds testified Bailey came in early and went to his truck to sleep. Noting this conduct violated Kohler's zero tolerance policy, the majority concludes this conduct reveals Bailey and Reynolds were similarly situated in all relevant respects. However, Reynolds did not testify Bailey failed to meet his production quota or work eight hours. Bailey testified he clocked in and normally began working. Bailey said

he achieved his production quota most days, including enough for overtime on occasions. He acknowledged he slept in his truck or went to the breakroom when he met his production. The EEOC then asked Bailey if he ever went to the parking lot when he had nothing to do during the day, and Bailey replied that "there's been a few times I'd go to the breakroom or something, but I'd come right on back and go to work." The record simply does not show Bailey worked seven hours and claimed eight hours of pay. No inference can be made based on this record that Bailey was similarly situated to Reynolds.

Finally, Alan Dickson was not similarly situated to Reynolds because he never worked seven hours and claimed eight hours pay. Alan produced over eight hours of work and claimed overtime for it, even though the policy at the time required him to remain on the clock to receive the overtime pay. For instance, if his quota was 10 pieces an hour and he produced 100 pieces in eight hours, he still had to remain on the premises for ten hours to receive overtime. John Dickson referred to this as a ridiculous rule that has since been revoked. In order to be paid overtime, Alan could have hung out in the breakroom or slept in the parking lot after meeting his overtime production. Instead, he left the premises. Reynolds, on the other hand, went to the breakroom before working at all, then only worked seven hours without meeting his production, and then claimed eight hours of pay. Alan Dickson and Reynolds were not similarly situated.

## C.    Strikingly Similar Precedent Supports District Court

In <u>Kipp v. Missouri Highway & Transportation Commission</u>, Kipp, a female maintenance crew worker, filed an EEOC complaint after she applied for and was denied a promotion. A friend of Kipp's co-worker learned of Kipp's discrimination claim and sent a letter to Kipp's employer informing them Kipp spent extended periods of time at the friend's house instead of working. Kipp's employer investigated the allegations and the district engineer, who knew about the discrimination complaint, terminated Kipp. Kipp sued her employer for gender

discrimination and retaliation. The jury found for the employer on the discrimination claim, but for Kipp on the retaliation claim. Kipp, 280 F.3d at 895. The district court denied the employer's motion for judgment as a matter of law on the retaliation claim. On appeal, the Eighth Circuit reversed, holding, "because the proof in this case fails to raise an inference that [Kipp's employer] acted out of a retaliatory motive in terminating her, Ms. Kipp failed to establish the causal link necessary to make out a prima facie case of retaliation." Id. at 898. As discussed above, our court easily rejected Kipp's temporal connection argument. Thus, the employer was entitled to judgment as a matter of law. Id.

Kipp argued many of her co-workers left their jobs without authorization and did not face discipline, which arguably raised an inference Kipp's employer retaliated against her. Id. at 897. We were unpersuaded by this argument because no evidence showed the executives terminating Kipp knew about those workers. Id. Thus, "a reasonable jury could not draw an inference that Ms. Kipp was singled out for discipline." Id. As in Kipp, Miller and Dickson were completely unaware of employees who had acted as Reynolds had, even though they gave Reynolds an opportunity to name other employees. It is undisputed Reynolds refused their requests. Like Kipp, we should hold that, because Dickson was unaware of similarly situated employees when he discharged Reynolds, no inference of retaliation can be established.

Kipp also argued her retaliation claim was supported by the fact that she was not warned before her discharge, she had a solid work record, and her supervisor did not think much of her leaving work without authorization. Id. at 897-98. The court "discern[ed] no supportable inference of retaliation in these facts" and took "the occasion to reaffirm the principle that 'federal courts do not sit as a super-personnel department that re-examines an entity's business decisions.' Although the jury may have believed that [Kipp's employer] should have handled Ms. Kipp's situation differently, that issue was not before it." Id. at 898 (citations omitted); see also Kiel,

169 F.3d at 1136 ("The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.").

The majority repeatedly asserts we should not lightly overturn jury verdicts, and, of course, we should not. In this case, the evidence did not allow the jury to find retaliation because the EEOC could not show similarly situated employees had engaged in Reynolds's conduct of claiming eight hours of pay for seven hours of work without being discharged. "In the absence of any evidence of discriminatory intent, however, it is not the prerogative of the courts or a jury to sit in judgment of employers' management decisions." Kiel, 169 F.3d at 1136. The district court's grant of judgment as a matter of law in Kohler's favor should be affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.