ROBERT HELVERING, APPELLANT, V.
UNION PACIFIC RAILROAD COMPANY, APPELLEE.
703 N.W.2d 134

Filed August 30, 2005. No. A-04-266.

820

Thomas F. Hoarty, Jr., and Scott A. Calkins, of Byam & Hoarty, for appellant.

Marlon A. Polk, Margot J. Wickman, and Dana E. Christian, of Polk, Waldman, Wickman & Council, P.C., L.L.O., for appellee.

IRWIN, SIEVERS, and CASSEL, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Robert Helvering appeals from an order of the district court granting summary judgment to Union Pacific Railroad Company (UP) on Helvering's amended petition alleging that his employment with UP was wrongfully terminated for discriminatory reasons, including retaliation, gender discrimination, and age

discrimination. Helvering challenges the district court's grant of summary judgment as to each of his claims. We conclude that Helvering failed to satisfy his burden of proof with respect to each of the claims and that UP was therefore entitled to a judgment as a matter of law on each of the claims. Accordingly, we affirm the order of the district court granting UP summary judgment on each of Helvering's claims.

## II. BACKGROUND

Helvering began his employment with UP in 1972. Helvering was transferred to Omaha in August 1990, at which time he was promoted from the position of dispatcher to the position of corridor manager, the direct supervisor of train dispatchers assigned to his area. Prior to 2000, there had been no complaints or disciplinary actions taken against Helvering.

On January 8, 2000, Don Murray, the director of human resources for UP's dispatching center in Omaha, received an electronic mail (e-mail) communication informing him of sexual harassment complaints made against Helvering. Murray was responsible for investigating complaints regarding alleged violations of UP's business conduct and equal employment opportunity (EEO) policies, and he initially investigated the complaints made against Helvering. As part of that investigation, a meeting was held on March 3, attended by Helvering, Murray, Mark Payne (Helvering's supervisor), and Dennis Jacobson (the vice president of UP's Omaha dispatching center).

During the meeting on March 3, 2000, the allegations in the complaint were explained to Helvering. Helvering was informed that he "had been seen touching, fondling, [or] caressing females in the workplace." The allegations against Helvering apparently also included "talking in a demeaning manner [and] belittling female train dispatchers," although Helvering denies that he was informed of such allegations. Helvering denied the allegations made against him. Helvering was counseled to make sure his behavior complied with UP's business conduct and EEO policies and warned that any conduct violating the policies would result in termination of his employment.

According to Helvering, he was directed to act in a professional manner with women and all employees at all times, not to

be involved in any touching of any kind with any employees, to treat others as he would want to be treated, and not to become involved in meetings where just he and a female train dispatcher were present. Helvering testified in a deposition that he told the others at the meeting it was impossible for him, because of his job duties, not to be involved in meetings where just he and a female train dispatcher were present and that he was instructed to "try not to find [him]self in a compromising position." According to Payne, Helvering was instructed "not to touch other employees or meet privately with female employees." According to Jacobson, Helvering was told that "he needed to be very, very careful in his work"; that he should engage in no touching, only business; not to get into any personal issues with anybody; and to stay on business and "not put himself in a position where he [would be] alone with any female employees." Helvering acknowledged that he was told that any further complaints involving his conduct could result in his dismissal from UP.

Payne testified in a deposition that Murray had told him that the allegations against Helvering were "not substantiated in [the] investigation." Similarly, Jacobson testified in a deposition that Murray had told him that the allegations against Helvering could not be substantiated. Kathleen Vance, UP's director of EEO and affirmative action, however, testified in a deposition that she did not agree that none of the allegations could be substantiated. Vance testified that what was found was that "there was only one woman who was willing to at that time meet with the EEO manager to follow up on sort of vague allegations." Vance stated, "It was more of personality issues and perhaps some racial insensitivity [concerning that woman, rather than a substantiation of sexual misconduct], but . . . as far as [that woman] went, she repeated complaints that she heard from other people, but she herself did not have any sexual harassment complaints . . . ." Vance further testified that "there were certainly a lot of allegations floating around that were difficult to prove, because people were unwilling to come forward and give their names and give their details." According to Vance, however, "there was certainly enough that was being said that was disturbing and was worrisome in terms of the behavior of a person in charge of supervising train dispatchers."

Christine Hampton was hired by UP in September 1999. Hampton was a train dispatcher. Hampton testified in a deposition that in January or February 2000, Hampton was warned by a manager of train dispatchers that Helvering "would probably make a pass at [her]" and that Helvering would retaliate against her when she rejected him. The manager also told Hampton about "other females that [Helvering] had approached, that [he] had touched," and told Hampton about an incident where Helvering allegedly "put his hand on [a woman's] breast" when posing for a photograph.

Hampton testified in a deposition that Helvering told a story during a UP safety meeting in March 2000. Helvering testified in a deposition that he believed the safety meeting occurred in February 2000. According to Hampton, Helvering prefaced the story by saying that it was a story Hampton "would like." According to Hampton, the story told by Helvering referenced Helvering's "being a referee and seeing a female in the stands wearing a short skirt with no undergarments. He said her legs were spread apart and he couldn't take his attention away from that particular situation." According to Helvering, the story was about a woman in the stands wearing a short skirt, but Helvering specifically denied having said that the story was for Hampton's benefit. Additionally, Vance testified in a deposition that she thought the version of the story she heard from Helvering while investigating this case did not include a "lack of underwear." Helvering testified in a deposition that he told the story as an illustration of the importance of staying focused while working and "just simply . . . keep[ing] your mind on what you're doing."

Hampton testified in a deposition that she had been required to "go on a road trip" for UP in March 2000 "to . . . visit and ride trains, ride with track inspectors and see the territories of your area that you're dispatching." Hampton testified that it was brought to her attention that Helvering "was telling the corridor managers and directors . . . that [Hampton] wanted him to attend this road trip with [her]." Hampton denied ever making such a request, and she informed a director that she "under no circumstances want[ed] to go on a road trip with . . . Helvering." Helvering did not accompany Hampton on the trip. Helvering

testified in a deposition that he never asked to accompany Hampton on the trip.

Hampton testified in a deposition that on May 25, 2000, as she was preparing to leave work for the day, Helvering asked her whether she had "a few minutes to talk." Hampton testified that she told Helvering she did not have time to talk, but that after Helvering asked a second time, she said, "[O]kay." According to Hampton, Helvering asked to talk "on the patio" or "by the security desk, or out front." According to Hampton, Helvering met her outside the building and asked, "[W]hat do you think of me?" Hampton testified that she answered Helvering by commenting on his capabilities as a "trainman," but that he asked her again what she thought of him and that her impression was that "he wanted something personal." Hampton testified that she again answered Helvering by commenting on his capabilities as a "trainman." According to Hampton, Helvering continued the conversation by telling Hampton about a female employee who had filed "an [Equal Employment Opportunity Commission] complaint" against him, the allegations of which could not be proven. Hampton recalled that "without taking a breath," Helvering then said to Hampton, "[A]ny red-blooded male would want to touch, I would want to touch you, would you consider meeting me outside of work[?]" Hampton testified that Helvering repeated the comment and again asked her whether they could "meet outside of work." Hampton testified that she said "absolutely not" and walked off.

Helvering testified in a deposition that when he was asked why he met with Hampton alone "after [being] told . . . not to," he answered, "I just plain forgot." Helvering testified that Hampton had approached him and asked to talk about something and that they had walked out of the building together. Helvering specifically denied having asked Hampton whether he could touch her or whether they could meet outside of work. The record indicates that there were other employees walking past Helvering and Hampton during this encounter.

Hampton testified in a deposition that she asked "to be moved out of the . . . region" where Helvering was corridor manager. Hampton also called Murray and left a voice mail message to

that effect on May 25 or 26, 2000. Hampton was interviewed by UP about her allegations against Helvering on May 26. On May 30, Payne and Jacobson met with Helvering to discuss Hampton's complaint. At that meeting, Helvering acknowledged having met with Hampton and was suspended, with pay, pending the outcome of an investigation into Hampton's complaint.

During the investigation, another female employee of UP alleged that on at least one occasion, Helvering had "placed his hand on her bare knee" at work. That employee, however, did not want the allegation pursued.

On May 28, 2000, Helvering sent an e-mail to Vance and Payne relating incidents of inappropriate language being used by female UP employees in his presence. In the e-mail, Helvering indicated that on May 19, one female employee had "said in a loud voice[,] 'YOU CAN KISS MY ASS.' " Helvering testified in a deposition that the statement was not directed at him and that he reported it to Payne and Vance because he heard that he had been accused of saying something in response and he wanted to provide his position on the statement.

In the e-mail, Helvering also indicated that on May 27, 2000, a female corridor manager had whispered some vulgar "directives" toward him. According to Helvering, the female corridor manager said, "I feel like I've been fucked all night, but when I fuck, I like to have hands-on." Helvering testified in a deposition that the comment was directed at him and was offensive and humiliating but did not interfere with his ability to do his job. Helvering testified that he reported the comment because it "was untimely" and because it was "convenient" to add a report of the comment to his e-mail.

In the e-mail, Helvering also complained about other "sexual n-u-indoes" by a female employee at the workplace. Helvering testified in a deposition that the sexual innuendoes he was referring to were primarily by two female employees. Helvering testified that one of the female employees' job differed from his and that the innuendoes involved laughing and making jokes and included such statements as one female employee's commenting, "I like it hard and fast, bring it on hard and fast." Helvering testified that the other female employee's job was the same as his and that "around [19]95" and "during [19]98," the employee

had commented on UP's "business casual" dress code by saying, "I don't wear underwear anyway, you want to feel?"

The record does not indicate that the female employees mentioned in Helvering's e-mail had been the subject of any prior complaints. After an investigation, the female employees mentioned in Helvering's e-mail were "disciplined accordingly." Vance testified in a deposition that the female employees were interviewed and provided with a review of EEO policies and counseling about appropriate language in the workplace. Helvering testified in a deposition that he learned that the female employees were "chastised" and that they "promised they would watch themselves from then on."

Helvering testified in a deposition that he met with Payne on May 30, 2000, and that Payne asked Helvering why he had e-mailed Vance. According to Helvering, Payne indicated that if Helvering had not sent the e-mail to Vance, UP "could have handled [Helvering's complaint] internally," but that because he did send the e-mail, UP had "to have a full-blown investigation." Helvering also testified that on some unspecified date when he had met with Murray, Murray had said that Helvering was "a middle-aged white male" and was "very vulnerable."

On June 16, 2000, Helvering's employment with UP was terminated. Payne testified in a deposition that he made the decision to terminate Helvering's employment. Payne testified that the investigation of the March 2000 complaint did not factor into his decision, but that he based his decision on Helvering's having been warned in March 2000 to be very careful and not put himself in a "precarious" position and on Payne's subsequently receiving "a very serious charge in May" that Helvering was making sexual advances toward a female employee. Payne further testified that the factors upon which he based the decision to terminate Helvering's employment were Helvering's going outside the building with Hampton, Helvering's use of the story during the safety meeting, Hampton's desire to be transferred rather than work with Helvering, and the other female employee's report that Helvering had placed his hand upon her knee. Payne testified that he "saw sexual harassment in the workplace, so [he] made a determination for termination" of Helvering's employment.

Jacobson testified in a deposition that the decision to terminate Helvering's employment was a consensus decision. Vance testified in a deposition that the decision about how to respond to the allegations against Helvering was discussed by Vance, Murray, Payne, and Jacobson. Jacobson testified that he believed Hampton and that Helvering was terminated because he had sexually harassed Hampton. Jacobson testified that he believed Helvering was trying to use his position to get sexual favors from Hampton. Payne indicated in an affidavit that the decision to terminate Helvering's employment was not influenced by Helvering's complaints about female employees' using inappropriate language and that Helvering's age and gender were not factors in the decision to terminate Helvering's employment.

On November 1, 2000, Helvering filed an amended petition. In the amended petition, Helvering alleged that his employment had been wrongfully terminated in retaliation for his filing a complaint against the use of inappropriate language by female employees, because of gender discrimination, and because of age discrimination. UP filed an answer on November 15, and Helvering filed a reply on November 20.

On February 3, 2004, the district court entered an order granting UP summary judgment as to each of Helvering's causes of action. The district court found that Helvering had failed to demonstrate a causal connection between the termination of his employment and his complaint about the language used by the female employees, that UP had demonstrated a legitimate nondiscriminatory reason for terminating his employment, and that he had failed to demonstrate that UP's proffered reason for terminating his employment was pretextual; as such, the court granted summary judgment against Helvering on his retaliation claim. The district court found that Helvering had previously been told not to be alone with female employees but had violated that order by being alone with Hampton, that Helvering and the female employees about whom he had complained were not similarly situated, and that he was "not likely" to sustain his gender discrimination claim; as such, the court granted summary judgment against Helvering on his gender discrimination claim. The district court found that Helvering had not obeyed an order not to be alone with female employees, that he had not been replaced by

a younger employee, and that he was "not likely" to sustain his age discrimination claim; as such, the court granted summary judgment against Helvering on his age discrimination claim. This appeal followed.

## III. ASSIGNMENTS OF ERROR

On appeal, Helvering has assigned eight errors, which we consolidate for discussion to three. First, Helvering asserts that the district court erred in granting UP summary judgment on his retaliation claim. Second, Helvering asserts that the district court erred in granting UP summary judgment on his gender discrimination claim. Third, Helvering asserts that the district court erred in granting UP summary judgment on his age discrimination claim.

## IV. ANALYSIS

### 1. GENERALLY APPLICABLE PRINCIPLES OF LAW

Although Helvering's assignments of error concern the district court's grant of summary judgment on three different causes of action, each of Helvering's causes of action is premised upon an assertion of discrimination in the decision to terminate his employment. While each cause of action is separate and unique, the principles of law governing summary judgment proceedings, and some other general principles of law, apply equally to each of the three causes of action.

### (a) Summary Judgment

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003). The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Id.*

### (b) Discrimination Claims

The Nebraska Fair Employment Practice Act (FEPA), Neb. Rev. Stat. §§ 48-1101 to 48-1126 (Reissue 2004), furthers "the

policy of [Nebraska] to foster the employment of all employable persons in the state on the basis of merit . . . and to safeguard their right to obtain and hold employment without discrimination." § 48-1101. FEPA is patterned from that part of the Civil Rights Act of 1964 contained in 42 U.S.C. § 2000e et seq. (2000), and it is appropriate to look to federal court decisions construing similar and parent federal legislation. See, *Airport Inn v. Nebraska Equal Opp. Comm.*, 217 Neb. 852, 353 N.W.2d 727 (1984); *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984); *Richards v. Omaha Public Schools*, 194 Neb. 463, 232 N.W.2d 29 (1975). See, also, *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 546 N.W.2d 827 (1996).

The well-known order and allocation of proof and burdens set forth in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), are applicable to discriminatory employment treatment claims, as well as retaliation claims. *Harris v. Misty Lounge, Inc.*, 220 Neb. 678, 371 N.W.2d 688 (1985); *Rose v. Vickers Petroleum, supra*. The plaintiff bears the burden to first prove to the fact finder by a preponderance of the evidence a prima facie case of discrimination. See, *Texas Dept. of Community Affairs v. Burdine, supra*; *Rose v. Vickers Petroleum, supra*. If the plaintiff proves a prima facie case, the defendant has the burden to articulate a legitimate nondiscriminatory reason for the employment decision to rebut the inference of discrimination raised by the plaintiff's prima facie claims. See *id*. Once the defendant produces such a reason, the plaintiff then has the burden to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was but a pretext for discrimination. See *id*. At all times, the plaintiff retains the ultimate burden of persuading the fact finder that he has been the victim of intentional impermissible conduct. See *id*. This same analysis has also been referred to as the *"McDonnell Douglas* test," applied in disparate treatment cases. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See, also, *Billingsley v. BFM Liquor Mgmt.*, 264 Neb. 56, 645 N.W.2d 791 (2002) (age discrimination action); *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999) (gender discrimination action).

 The U.S. Supreme Court in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), heightened the employee's burden in discrimination cases. It is now incumbent upon an employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. See *id*. See, also, *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). The trier of fact may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise. See, *Texas Dept. of Community Affairs v. Burdine, supra*; *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978); *Rose v. Vickers Petroleum, supra*.

## 2. RETALIATION CLAIM

Helvering first asserts that the district court erred in granting UP summary judgment on Helvering's claim that UP's termination of his employment was unlawful retaliation. Although we conclude that Helvering satisfied his burden of adducing sufficient evidence to demonstrate a prima facie case of discrimination, we conclude that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment and that Helvering failed to satisfy his burden of demonstrating that the proffered basis was merely pretextual. As such, we conclude that the district court correctly granted UP summary judgment on the retaliation claim.

### (a) Helvering's Prima Facie Case

It was Helvering's burden to first demonstrate a prima facie case of discrimination. See, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 546 N.W.2d 827 (1996). Although we disagree with some factual conclusions reached by the district court on what we conclude were genuine disputes of fact, we ultimately conclude that the district court correctly made an implicit finding that Helvering satisfied his initial burden, demonstrating a prima facie case of discrimination, by showing that he engaged in arguably protected activity, namely sending an e-mail notifying UP about inappropriate language being used by female employees; by showing that he suffered an

adverse employment action when his employment was terminated; and by demonstrating circumstantially a causal connection between his activity and the adverse action by virtue of the very close temporal proximity between those two events.

In his amended petition, Helvering asserted that his retaliation claim was brought under Neb. Rev. Stat. § 20-148 (Reissue 1997) and § 48-1114. Section 20-148 authorizes a private civil cause of action for private acts of discrimination by private employers. See *Cole v. Clarke*, 8 Neb. App. 614, 598 N.W.2d 768 (1999). Section 48-1114 provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees . . . because he or she (1) has opposed any practice made an unlawful employment practice by [FEPA], (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [FEPA], or (3) has opposed any practice or refused to carry out any action unlawful under federal law or the laws of [Nebraska].

FEPA makes it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful practice. § 48-1114; *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003). The Nebraska Supreme Court has held that the "unlawful" practices covered by § 48-1114 are activities related to the employment. See *Wolfe v. Becton Dickinson & Co., supra.* As such, seen in the context of the entirety of FEPA and in light of the apparent purposes FEPA is meant to serve, the term "practice" in § 48-1114(3) refers to an unlawful practice of the employer, not unlawful or prohibited actions of coemployees. *Wolfe v. Becton Dickinson & Co., supra.* FEPA is not a general bad acts statute, and there are many abuses not proscribed by FEPA-type legislative acts, including discharge for opposition to racial discrimination by other employees against the public and discharge for opposition to discrimination based on an employee's sexual orientation. *Wolfe v. Becton Dickinson & Co., supra.* See, also, *Hamner v. St. Vincent Hosp. and Health Care Center*, 224 F.3d 701 (7th Cir. 2000); *Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125 (2d Cir. 1999).

In analyzing the evidence in a retaliation case, the elements of a prima facie case for retaliation are that the plaintiff

must show that (1) he or she was engaging in a protected activity, (2) he or she suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision. *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 546 N.W.2d 827 (1996). See *Wolfe v. Becton Dickinson & Co., supra* (prima facie case consists of discharge following protected activity of which employer was aware). See, also, *Ruggles v. California Polytechnic State University*, 797 F.2d 782 (9th Cir. 1986). Although there is authority to the contrary, the majority view is that an employee is not required to prove the merits of the underlying discrimination charge which forms the basis for the alleged retaliatory treatment so long as the employee possessed a good faith belief that the offensive conduct violated the law. *Rose v. Vickers Petroleum, supra.* See *Wolfe v. Becton Dickinson & Co., supra* (belief must be reasonable but need not necessarily be correct to form underlying basis for retaliation claim).

Helvering asserted that the termination of his employment was motivated by his complaint that female employees were using inappropriate language. The district court found that this assertion was "an unsupported allegation," that UP had sufficient reason to terminate Helvering's employment before he made the complaint, and that Helvering failed to meet his burden to show that UP's reason for terminating his employment was pretextual. The issues on appeal are whether the evidence presented to the district court demonstrates a genuine issue of material fact concerning the elements of Helvering's retaliation claim and whether UP was entitled to judgment as a matter of law.

### (i) Protected Activity

It is not entirely clear what protected activity Helvering is alleging he engaged in to form the underlying basis for his retaliation claim. His petition referenced only § 48-1114(3), and his argument on appeal references only his "complaint" in an e-mail about the inappropriate language used by female employees of UP. See brief for appellant at 18. It is not entirely clear that Helvering's complaint was protected activity, although we will assume, without expressly so concluding, that it was. The district court did not grant summary judgment on the basis of Helvering's

activity's not being protected, and our resolution of other issues with respect to the retaliation claim makes an express determination on this element unnecessary.

An individual who has opposed discriminatory employment practices is protected under § 48-1114(1). *Rose v. Vickers Petroleum, supra.* Helvering has not asserted that UP was engaging in any discriminatory employment practices and has not asserted that he voiced any opposition to a discriminatory employment practice when he sent the e-mail discussing the use of inappropriate language by female employees. As such, it does not appear that Helvering is asserting a protected activity under § 48-1114(1), and Helvering does not even reference § 48-1114(1) in either his petition or his brief on appeal.

Section 48-1114(2), although not referenced by Helvering in either his petition or his brief on appeal, prohibits discrimination against an employee who "has made a charge" under FEPA. Section 48-1104(1) makes it unlawful for an employer to harass any individual because of sex, and § 48-1102(14) includes the creation of a hostile working environment as "[h]arass[ment] because of sex." As such, it is arguable that Helvering's assertion that he was fired for making a "complaint" about inappropriate language being used by female employees constitutes a charge that UP was allowing a hostile working environment. The difficulty in this position, however, is that Helvering's e-mail discussing the inappropriate language did not actually request UP to take any action, and Helvering's own testimony in a deposition indicated that the e-mail was not sent with the purpose of having UP take any action; rather, Helvering testified that the e-mail was sent to get his side of the story out and because of the timing of the female employees' comments.

The evil addressed by § 48-1114(3) is the exploitation of the employer's power over the employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer. *Wolfe v. Becton Dickinson & Co.*, 266 Neb. 53, 662 N.W.2d 599 (2003). The text of § 48-1114(3) and reasonable policy dictate that an employee's opposition to any unlawful act of the employer, whether or not the employer pressures the employee to actively join in the illegal activity, is protected under § 48-1114(3). *Wolfe v. Becton*

*Dickinson & Co., supra.* Helvering specifically references § 48-1114(3) in both his petition and his brief on appeal. He has not, however, made any assertion or offered any evidence to indicate that UP in any way coerced him to endorse, through participation or acquiescence, any unlawful acts by UP.

We determine that it is unnecessary to explicitly determine whether Helvering has demonstrated that he engaged in a protected activity. Although the specific subsection of the statute referenced by Helvering in both his petition and his brief on appeal does not seem applicable, and although the applicability of the remaining subsections of § 48-1114 is questionable, we will assume for the purpose of discussion that Helvering's e-mail constituted a complaint that UP was allowing a hostile working environment by allowing female employees to use inappropriate language.

### (ii) Adverse Employment Decision

There is no dispute in this case that Helvering suffered an adverse employment decision. Helvering's employment with UP was terminated. As such, it is clear that Helvering sufficiently alleged and demonstrated this element of his prima facie case.

### (iii) Causal Connection

The final element of Helvering's prima facie case for retaliation is that Helvering was required to demonstrate that there was a causal link between the allegedly protected activity and the adverse employment decision. The district court specifically found that Helvering had "offered no evidence that [his e-mail complaint concerning inappropriate language by female employees] caused his termination. This is merely an unsupported allegation by him." The district court also found that UP had sufficient reason to terminate Helvering prior to the date of his e-mail, namely "[a]n investigation resulting in [Helvering's] being warned that he could be terminated if he met with a female employee outside the presence of other employees, which he admitted to, and the allegation by [Hampton] that he propositioned her." We disagree with the district court's implicit determination that there was no genuine issue of fact concerning UP's having a sufficient reason to terminate Helvering's employment prior to his e-mail.

The record indicates, contrary to the district court's implicit conclusion, that there is a genuine issue of fact concerning whether Helvering was warned that his employment could be terminated if he met with a female employee outside the presence of other employees, whether Helvering actually "violated" any such prohibition, and whether Helvering propositioned Hampton as she alleged. Although Jacobson testified in a deposition that Helvering had been told that "he should not put himself in a position where he is alone with any female employees," Helvering testified in a deposition that he had told Payne, Jacobson, and Murray it was "impossible" for him never to be in meetings alone with a female and that they had told him to "try not to find [himself] in a compromising position." Additionally, the testimony was conflicting about what actually happened when Helvering met with Hampton, and the evidence indicated that the meeting was not in private but had occurred with other employees coming and going in the same vicinity. Finally, although Hampton alleged that Helvering had propositioned her during the meeting, Helvering specifically denied the allegation. As such, whether there was a sufficient basis to terminate Helvering's employment prior to the date when he sent the e-mail requires resolution of facts about which there is a genuine dispute.

More important, however, is the fact that Helvering presented evidence that the temporal proximity between his allegedly protected activity and the adverse employment action was very close. In *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002), the Eighth Circuit Court of Appeals discussed the possibility that temporal proximity between protected activity and an adverse employment action can be sufficient to circumstantially demonstrate causality. The court noted that sometimes, "the timing of one incident of adverse employment action following protected activity suffice[s] to establish causal connection." *Id.* at 832. " 'The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.' " *Id.* at 833 (quoting *Clark County School Dist. v. Breeden*, 532 U.S. 268, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam)).

For example, in *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001), the court held that proximity of a "matter of weeks" between disclosure of a potentially disabling condition and adverse employment action was sufficient to complete a prima facie case of discrimination. Similarly, in *Smith v. Allen Health Systems, Inc., supra*, the court concluded that proximity of approximately 2 weeks between the beginning of family leave and adverse employment action was sufficient, if barely so, to establish causation and complete a prima facie case of discrimination.

In the present case, Helvering sent his e-mail, which event we have above assumed for discussion to constitute protected activity, on May 28, 2000, and his employment was terminated on June 16, a proximity of fewer than 3 weeks. Under the precedent established by the Eighth Circuit, we conclude that this temporal proximity alone is sufficient evidence to circumstantially establish the causal connection needed to complete Helvering's prima facie case. The district court recognized as much by noting that "[s]tanding alone, the fact that [Helvering] was terminated two weeks after submitting a complaint may circumstantially establish a causal connection between the protected activity and the subsequent adverse employment action." Notwithstanding the district court's contrary statement that Helvering's allegation of a causal connection was "unsupported," the district court appeared to recognize that Helvering had demonstrated a sufficient causal connection by demonstrating the very close temporal proximity between the allegedly protected activity and the adverse employment action.

### (iv) Conclusion on Prima Facie Case

We conclude that the district court improperly resolved genuine issues of fact concerning the causal connection between the allegedly protected activity and the adverse employment action. Nonetheless, it is apparent that the district court implicitly found that Helvering had satisfied his burden to demonstrate a prima facie case of discrimination, at least sufficiently so to survive summary judgment. For the purpose of our analysis, we agree with the district court's implicit conclusion that Helvering engaged in protected activity, suffered an adverse employment action, and demonstrated a causal connection between the two, at

least circumstantially based on the temporal proximity between the two.

### (b) UP's Legitimate Nondiscriminatory Basis

Because Helvering demonstrated a prima facie case of discrimination, it became UP's burden to demonstrate a legitimate nondiscriminatory basis for terminating Helvering's employment. See, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 546 N.W.2d 827 (1996). UP asserted in its answer to Helvering's amended petition that Helvering's complaint should be "barred by his own conduct in creating a hostile work environment in direct violation of" §§ 48-1114 and 20-148. We agree with the district court's implicit conclusion that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment, because the evidence indicates that Helvering's employment was terminated because of suspicion of sexual harassment.

Payne testified in a deposition that he made the decision to terminate Helvering's employment. Payne testified that the incidents he relied on "as creating a hostile environment by" the actions of Helvering were as follows:

> I met with . . . Helvering in early March [2000] and told him to be very careful, not put himself in a position, precarious position, with respect to others, Golden Rule. And I get a very serious charge in May from this dispatcher, [Helvering] is making sexual advances to her.
>
> In my investigation, I started uncovering stories here and there of sexual behavior, so I decided to terminate him.

Payne also testified that Helvering used bad judgment in using the "basketball story," which referenced females, at the safety meeting. Payne testified that "[b]ased on [his] gathering of the facts as [he] could, [he] saw sexual harassment in the workplace, so [he] made a determination for termination." Payne acknowledged that he determined that terminating Helvering's employment was appropriate based on "Helvering's bad judgment in going outside the building . . . with Hampton[,] based upon [Helvering's] use of the basketball story at the safety meeting, and . . . based upon Hampton's request not to work with

Helvering and [the] statement that Helvering had put his hand on [another female employee's] knee."

Jacobson testified in a deposition that the decision to terminate Helvering's employment was "a consensus decision" and that had it not been, he "would have forced it." Jacobson testified that Helvering's employment was terminated "[b]ecause he sexually harassed" Hampton. To support his conclusion that Helvering was guilty of sexual harassment, Jacobson pointed to Helvering's alleged attempts to take a road trip with Hampton, Helvering's telling of an offcolor story at the safety meeting, Helvering's meeting with Hampton, and Hampton's trying to get away from Helvering. Jacobson testified that he believed Hampton. According to Jacobson, Helvering was "trying to use his position to get sexual favors with . . . Hampton."

Based on the evidence presented, it is apparent that UP sufficiently demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment. Although the district court did not specifically discuss UP's legitimate nondiscriminatory basis, the court did conclude that Helvering failed to meet his burden to demonstrate that UP's "reason" for terminating Helvering's employment was pretextual, implicitly finding that UP had demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment. Based on the evidence presented, we agree that UP satisfied its burden in this regard.

(c) Helvering's Demonstration of Pretext

Because UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment, it became Helvering's burden to demonstrate that the proffered basis was merely pretextual. See, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); Rose v. Vickers Petroleum, 4 Neb. App. 585, 546 N.W.2d 827 (1996). We agree with the district court that Helvering failed to satisfy this burden, because he presented no evidence, other than the temporal proximity between the allegedly protected activity and the adverse employment action, to suggest that the real reason UP terminated his employment was discriminatory and not legitimate.

We have noted that the U.S. Supreme Court in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 125 L.

Ed. 2d 407 (1993), heightened the employee's burden in discrimination cases. It is now incumbent upon an employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. See *id.* See, also, *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). The trier of fact may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise. See, *Texas Dept. of Community Affairs v. Burdine, supra*; *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978); *Rose v. Vickers Petroleum, supra.*

█ Further, in *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002), the court specifically held that although temporal proximity may be sufficient to demonstrate a prima facie case of discrimination, temporal proximity alone is not sufficient to satisfy the burden to show pretext. The court held that although strong evidence of a prima facie case can also be considered to establish pretext, proof of pretext or actual discrimination requires more substantial evidence. As such, although the plaintiff may attempt to establish intentional discrimination by showing that the employer's proffered explanation is unworthy of credence and the trier of fact may consider the evidence establishing the prima facie case, see *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), where temporal proximity is the only evidence establishing causality, such temporal proximity alone is usually insufficient to establish pretext. See *E.E.O.C. v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003).

In the present case, as we noted above, Helvering demonstrated the very close temporal proximity between his allegedly protected activity and the termination of his employment. Other than this temporal proximity, however, there is no evidence in the record indicating that UP was actually motivated by a desire to retaliate or discriminate against Helvering rather than by a conclusion that Helvering was guilty of sexual harassment. Helvering failed to satisfy the heightened burden of proof required to demonstrate pretext or intentional discrimination.

#### (d) Conclusion on Retaliation

Although we conclude that Helvering arguably demonstrated a prima facie case of discrimination, we conclude that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment and that Helvering failed to demonstrate that UP's proffered basis was pretextual. Helvering demonstrated a prima facie case of discrimination by showing that he had engaged in an arguably protected activity, namely submitting an e-mail about inappropriate language being used by female employees; by showing that he suffered an adverse employment action when his employment was terminated; and by circumstantially demonstrating a causal connection between his activity and the adverse action by virtue of the very close temporal proximity between those two events. UP, however, demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment by showing that Helvering's employment was terminated because UP believed that he was guilty of sexual harassment. Helvering failed to adduce sufficient evidence to satisfy his burden to demonstrate that UP's proffered basis was merely pretextual, and UP was therefore entitled to judgment as a matter of law on Helvering's retaliation claim. As such, we find no merit to Helvering's assertions on appeal that the district court erred in granting UP summary judgment on the retaliation claim.

#### 3. Gender Discrimination Claim

Helvering next asserts that the district court erred in granting UP summary judgment on Helvering's claim that UP's termination of his employment was unlawful gender discrimination. Because we conclude that Helvering failed to satisfy his burden of adducing sufficient evidence to demonstrate that he was treated differently from similarly situated persons of the opposite sex, and because we conclude that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment and Helvering failed to satisfy his burden of demonstrating that the proffered basis was merely pretextual, we conclude that the district court correctly granted UP summary judgment on the gender discrimination claim.

### (a) Helvering's Prima Facie Case

■ It was Helvering's burden to first demonstrate a prima facie case of gender discrimination. See *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). See, also, *Riggs v. County of Banner*, 159 F. Supp. 2d 1158 (D. Neb. 2001). We conclude that Helvering failed to demonstrate that UP discriminated against Helvering, a member of the "majority" class of male employees, and conclude that Helvering failed to demonstrate that any similarly situated female employees were treated differently. A prima facie case of gender discrimination requires the plaintiff to prove that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex. *Riggs v. County of Banner, supra.*

### (i) Protected Class

■ On the record presented at the summary judgment hearing, Helvering failed to satisfy the first element of a prima facie case because he failed to demonstrate that he was a member of a protected class or that UP discriminated against male employees. In reverse discrimination cases, the first element of the prima facie case is modified to require proof " 'that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.' " *Riggs v. County of Banner*, 159 F. Supp. 2d at 1165 (quoting *Duffy v. Wolle*, 123 F.3d 1026 (8th Cir. 1997), *cert. denied* 523 U.S. 1137, 118 S. Ct. 1839, 140 L. Ed. 2d 1090 (1998)). See, also, *Notari v. Denver Water Dept.*, 971 F.2d 585 (10th Cir. 1992).

In the present case, Helvering adduced no evidence to suggest that UP is that "unusual employer who discriminates against the majority." See *Riggs v. County of Banner, supra.* There is no evidence in the record to suggest any background circumstances supporting a suspicion that UP tends to discriminate against males. As such, it is apparent that Helvering failed to satisfy the first element of his prima facie case.

### (ii) Helvering's Qualifications

The record does not contain any dispute about Helvering's qualifications to perform the job of corridor manager. Helvering

had been employed by UP since 1972, and the record does not indicate any suggestion of prior performance problems. Even if the allegations of sexual harassment could be somehow construed to call into question his qualifications to continue his employment, the record indicates that Helvering, at a minimum, presented sufficient evidence to generate a genuine factual issue about his qualifications when he testified in a deposition that he had denied the allegations against him. As such, this element was arguably satisfied.

### (iii) Adverse Employment Action

Once again, there is no dispute that Helvering suffered an adverse employment action when his employment was terminated. As such, this element does not appear to be disputed and this element was satisfied.

### (iv) Disparate Treatment

The district court specifically found that Helvering had failed to adduce sufficient evidence to support a finding that he was treated differently from similarly situated female employees of UP. We agree with the district court's conclusion that Helvering failed to demonstrate that he was treated differently from similarly situated female employees because Helvering failed to establish that the female employees who were the subject of his e-mail were similarly situated to him.

The test to determine whether employees are similarly situated to warrant a comparison to a plaintiff is a rigorous one. *E.E.O.C. v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003). Specifically, the individuals used for comparison must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. *Id.* For discriminatory discipline claims, employees are considered similarly situated when they are involved in or accused of the same offense and are disciplined in different ways. *Id.* The plaintiff has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence. *Id.*

In the present case, Helvering failed to satisfy this burden. Helvering's assertion is that the female employees who used

inappropriate language and who were referenced in his e-mail were similarly situated to him. However, Helvering failed to demonstrate that those employees had the same supervisor or were subject to the same standards. In fact, Helvering's own testimony in a deposition indicated that at least some of the female employees had different positions from his at UP. Of even more importance, however, is that Helvering failed to demonstrate that the alleged misconduct was the same. Helvering was accused of sexual harassment and was alleged, inter alia, to have told a sexually harassing story at a safety meeting and to have propositioned a female employee. Helvering alleged in his e-mail that the female employees had used inappropriate language. Helvering has failed to demonstrate how these allegations involve the same conduct.

Additionally, as the district court found, the record indicates that Helvering and the female employees were not similarly situated, because Helvering had previously been accused of sexual harassment and had previously been investigated for sexual harassment, whereas the record does not indicate any prior complaints or investigations concerning the female employees. Indeed, the record indicates that when Helvering was first accused of sexual harassment, he was spoken to by UP and was counseled to comply with UP's policies and not to put himself into a difficult position; when Helvering sent his e-mail concerning the female employees, they were spoken to by UP and were counseled to comply with UP's policies. It is arguable whether Helvering and the female employees were even treated differently, inasmuch as Helvering was terminated only upon the second accusation and investigation of sexual harassment. As such, Helvering failed to demonstrate that he was treated differently from similarly situated female employees.

(b) Conclusion on Gender Discrimination

Helvering failed to demonstrate a prima facie case of gender discrimination. Helvering failed to demonstrate that he is in a protected class or that UP discriminates against male employees, and he failed to demonstrate that he was treated differently from similarly situated female employees; he failed to demonstrate both that the female employees were treated differently and that they were similarly situated to him. As such, we find no merit to

Helvering's assertions concerning his gender discrimination claim. UP was entitled to a judgment as a matter of law, and the district court did not err in granting UP summary judgment on Helvering's gender discrimination claim.

### 4. AGE DISCRIMINATION CLAIM

Helvering next asserts that the district court erred in granting UP summary judgment on his claim that UP's termination of his employment was unlawful age discrimination. We conclude that even if Helvering demonstrated a prima facie case of age discrimination, Helvering failed to adduce sufficient evidence to demonstrate that the legitimate nondiscriminatory reason proffered by UP for terminating his employment was pretextual. As such, we conclude that the district court did not err in granting UP summary judgment on Helvering's age discrimination claim.

### (a) Helvering's Prima Facie Case

It was Helvering's burden to first demonstrate a prima facie case of age discrimination. See, *Billingsley v. BFM Liquor Mgmt.*, 264 Neb. 56, 645 N.W.2d 791 (2002); *Allen v. AT&T Technologies*, 228 Neb. 503, 423 N.W.2d 424 (1988); *Apland v. Northeast Community College*, 8 Neb. App. 621, 599 N.W.2d 233 (1999). We conclude that the record does not establish sufficient evidence for us to find that Helvering demonstrated a prima facie case. To establish a prima facie case of age discrimination, the plaintiff must establish that (1) he or she was in the protected group, (2) he or she was subjected to an adverse employment action, (3) he or she was qualified for the employment position or benefit adversely denied, and (4) other similarly situated persons not in the protected group were treated differently. See *id*. We conclude that Helvering failed to satisfy his burden with respect to the last element, disparate treatment.

### (i) Protected Group

There is no dispute in this case that Helvering was within the relevant protected age group. Nebraska's Act Prohibiting Unjust Discrimination in Employment Because of Age, Neb. Rev. Stat. § 48-1001 et seq. (Reissue 2004), makes it unlawful to discriminate against a person who is at least 40 but fewer than 70 years of age, unless such age distinction is made for legitimate

and reasonable purposes. See *Apland v. Northeast Community College, supra.* Helvering alleged in his amended petition that he was approximately 48 years of age at the time his employment was terminated, and UP admitted this allegation in the answer. As such, this element of Helvering's prima facie case was satisfied.

### (ii) Adverse Employment Action

There is also no dispute that Helvering suffered an adverse employment action when his employment with UP was terminated. As such, this element of Helvering's prima facie case was also satisfied.

### (iii) Helvering's Qualifications

As we previously mentioned, the record does not contain any dispute about Helvering's qualifications to perform the job of corridor manager. Helvering had been employed by UP since 1972, and the record does not indicate any suggestion of prior performance problems. Even if the allegations of sexual harassment could be somehow construed to call into question his qualifications to continue his employment, the record indicates that Helvering, at a minimum, presented sufficient evidence to generate a genuine factual issue about his qualifications when he testified in a deposition that he had denied the allegations against him. As such, this element was arguably satisfied.

### (iv) Disparate Treatment

Helvering alleged in his amended petition that the female employees who were the subject of his e-mail were "30 to 40" years of age and that they were treated differently from Helvering because they were not terminated. Our review of the record does not indicate that any evidence was adduced concerning the ages of any of the female employees, and we note that Helvering's brief on appeal cites only to his allegation in the transcript in support of his argument that the female employees "were younger." Brief for appellant at 38. In addition, as discussed in some detail above, Helvering failed to adduce sufficient evidence to show, in demonstration of disparate treatment, that the female employees were similarly situated to Helvering. Finally, the record does not demonstrate that Helvering was replaced by an employee outside of the protected group.

As such, it is apparent that Helvering failed to adduce sufficient evidence to demonstrate this element, and Helvering thus failed to demonstrate a prima facie case of age discrimination. UP was therefore entitled to a judgment as a matter of law, and the district court did not err in granting UP summary judgment on the age discrimination claim.

### (b) UP's Legitimate Nondiscriminatory Basis

Assuming that Helvering could be found to have demonstrated a prima facie case of age discrimination, the burden would shift to UP to demonstrate a legitimate nondiscriminatory basis for terminating Helvering's employment. See, *Billingsley v. BFM Liquor Mgmt.*, 264 Neb. 56, 645 N.W.2d 791 (2002); *Allen v. AT&T Technologies*, 228 Neb. 503, 423 N.W.2d 424 (1988); *Apland v. Northeast Community College*, 8 Neb. App. 621, 599 N.W.2d 233 (1999). In this case, as discussed in more detail above, UP demonstrated that Helvering's employment was terminated because UP believed that Helvering was guilty of sexually harassing a female employee. As such, and for the reasons discussed in more detail above, we conclude that UP would have satisfied its burden to demonstrate a legitimate nondiscriminatory basis for terminating Helvering's employment even if Helvering could be found to have demonstrated a prima facie case of age discrimination.

### (c) Helvering's Demonstration of Pretext

Because UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment, the burden would have shifted back to him to demonstrate that the proffered basis was merely pretext. See, *Billingsley v. BFM Liquor Mgmt., supra*; *Allen v. AT&T Technologies, supra*; *Apland v. Northeast Community College, supra*. Even if Helvering could be found to have satisfied his burden to demonstrate a prima facie case of age discrimination, we agree with the district court that Helvering failed to demonstrate that UP's proffered basis for terminating his employment was merely pretextual. Helvering presented no evidence to suggest that the real reason UP terminated his employment was discriminatory and not legitimate.

As noted above, the U.S. Supreme Court in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d

407 (1993), heightened the employee's burden in discrimination cases, and it is now incumbent upon an employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. See, also, *Ventura v. State*, 246 Neb. 116, 517 N.W.2d 368 (1994). The trier of fact may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise. See, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978); *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 546 N.W.2d 827 (1996).

In the present case, Helvering testified in a deposition that Murray had once said to Helvering that Helvering was "a middle-aged white male [and was] very vulnerable." It is not clear from the record when Murray allegedly made this comment. Additionally, Helvering testified that UP had "a history of terminating people that are nearing retirement to save the officers' pension." Helvering was questioned about former employees whose employment he was alleging had been terminated when they neared retirement, and he identified two former employees. Helvering acknowledged that one had had a disability and received disability benefits at the time his employment was terminated, but he acknowledged that he did not know whether the other had lost any benefits which had vested prior to the termination of his employment.

We conclude that the meager evidence presented by Helvering was insufficient as a matter of law to meet the heightened burden to demonstrate pretext. The evidence is insufficient to demonstrate that UP's proffered reason for terminating Helvering's employment, because of a belief that he had sexually harassed a female employee, was false and that the true motive for terminating his employment was discrimination. As such, we conclude that Helvering failed to satisfy his burden of proof and that UP was entitled to a judgment as a matter of law. The district court did not err in granting UP summary judgment on Helvering's age discrimination claim.

## (d) Conclusion on Age Discrimination

Helvering failed to demonstrate a prima facie case of age discrimination because he failed to demonstrate disparate treatment. Helvering failed to adduce sufficient evidence to show that similarly situated employees not in the protected age group were treated differently from him; he failed to demonstrate both that the female employees were similarly situated to him and that they were not in the protected age group. In addition, even if Helvering could be found to have demonstrated a prima facie case, UP demonstrated a legitimate nondiscriminatory basis for terminating his employment upon a belief that he had sexually harassed a female employee, and Helvering failed to adduce sufficient evidence to demonstrate that UP's proffered reason was merely pretextual. As such, we find no merit to Helvering's assertions concerning his age discrimination claim. UP was entitled to a judgment as a matter of law, and we conclude that the district court did not err in granting UP summary judgment on the age discrimination claim.

## V. CONCLUSION

The district court did not err in granting UP summary judgment on Helvering's retaliation claim, Helvering's gender discrimination claim, and Helvering's age discrimination claim. Helvering failed to satisfy his burden of proof with respect to each of the claims, and UP was entitled to a judgment as a matter of law on each. The order of the district court granting UP summary judgment on each of the claims is affirmed.

AFFIRMED.